# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TAMIKA HALL, | |
| Plaintiff, | |
| v. | Civil Action No. 20-2073 (BAH) |
| | Chief Judge Beryl A. Howell |
| KILOLO KIJAKAZI,<br>*Acting Commissioner of Social Security*, | |
| Defendant. | |

## MEMORANDUM OPINION

Plaintiff Tamika Hall has moved for a judgment reversing the denial of her claim for Supplemental Security Income ("SSI") benefits, Pl.'s Mot. for J. of Reversal ("Pl.'s Mot."), ECF No. 11, and defendant, the Acting Commissioner of Social Security, has cross-moved for a judgment affirming the denial by the Social Security Administration ("SSA"), Def.'s Mot. for J. of Affirmance and in Opp'n to Pl.'s Mot. for J. of Reversal ("Def.'s Cross-Mot."), ECF No. 12. [1] For the reasons explained below, plaintiff's motion is denied and defendant's cross-motion is granted.

## I.    BACKGROUND

Following review of the applicable statutory framework, the pertinent factual and procedural history is described.

---

[1]    Acting Commissioner Kilolo Kijakazi is substituted as defendant for former Commissioner Andrew M. Saul.  *See* FED. R. CIV. P. 25(d)

**A. Statutory and Regulatory Framework**

To qualify for SSI disability benefits under Title XVI of the Social Security Act, plaintiff must establish that she is "disabled."  42 U.S.C. § 1382(a)(1).  Disability means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  *Id.* § 1382c(a)(3)(A).  "[A]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments" are so severe that she "is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 1382c(a)(3)(B).

The SSA has established a five-step sequential evaluation process for assessing a claimant's alleged inability to work, *see* 20 C.F.R. § 416.920, with the claimant carrying the burden of proving disability, *Butler v. Barnhart*, 353 F.3d 992, 997 (D.C. Cir. 2004).  The claimant must demonstrate, at step one, that she is not presently engaged in "substantial gainful" work, 20 C.F.R. § 416.920(a)(4)(i), and, at step two, that she has a "severe impairment," which "significantly limits [her] physical or mental ability to do basic work activities," *id.* §§ 416.920(a)(4)(ii), 416.920(c), and must have lasted or be expected to last at least 12 months, *id.* § 416.909.  At step three, the claimant must demonstrate that she suffers from a disabling impairment, *id.* § 416.920(a)(4)(iii), based on the list of conditions qualifying as disabling under the Commissioner's regulations.  *See id.* Pt. 404, Subpt. P, App. 1 ("SSA Appendix 1").  If a claimant's condition "meets the duration requirement and is listed in [A]ppendix 1 or is equal to a listed impairment[]," the claimant is considered disabled.  *Id.* § 416.920(d); *see also Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) ("[I]f an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded

2

benefits without a determination whether he actually can perform his own prior work or other work.").

If the third step is not satisfied, the inquiry proceeds to the fourth step, but following an assessment of the claimant's residual functional capacity. 20 C.F.R. § 416.920(e). Such an assessment requires a determination of a claimant's ability to do physical and mental work activities on a sustained basis despite limitations from any and all of her impairments, including those that are not severe. *See id.* §§ 416.920(e), 416.945. Generally, an individual's residual functional capacity reflects "what [he or she] can still do despite his or her limitations." *Ross v. Astrue*, 636 F. Supp. 2d 127, 132 (D.D.C. 2009). Then, at the fourth step, the claimant must show that the residual functional capacity assessment confirms that her impairments prevent her from performing her "past relevant work." 20 C.F.R. §§ 416.920(e)–(f); *see also Jones v. Astrue*, 647 F.3d 350, 352–53 (D.C. Cir. 2011) (noting step four "requires the claimant to show that he does not have the 'residual functional capacity' to perform the requirements of his past relevant work").

"A claimant who can perform her previous work is not disabled, but if she demonstrates her inability to perform her previous work, the ALJ must then determine at step five whether the claimant can make an adjustment to other work while taking into consideration the claimant's residual functional capacity." *Saunders v. Kijakazi*, 6 F.4th 1, 3–4 (D.C. Cir. 2021). At step five, "the burden shifts to the Commissioner," *id*. at 4, to show that "other work" is available for the claimant to perform, based on a consideration of her residual functional capacity, age, education, and work experience. 20 C.F.R. § 416.920(g); *see also Butler*, 353 F.3d at 997; *Saunders*, 6 F.4th at 4; *Stankiewicz v. Sullivan*, 901 F.2d 131, 133 (D.C. Cir. 1990) ("the Secretary has the burden of proving that given a claimant's age, education, work experience, and

residual non-disability, he is still capable of doing work other than his past relevant work");

*Smith v. Bowen*, 826 F.2d 1120, 1122 (D.C. Cir. 1987) ("the Secretary has the burden of showing

that the claimant is capable of performing gainful work").  If the claimant cannot perform other

work, she is deemed disabled.  *See Sullivan v. Finkelstein*, 496 U.S. 617, 620 (1990) ("Under

that five-step process, even if a wage earner's impairment does not meet or equal one of the

listed impairments, the wage earner may nonetheless be entitled to disability . . . benefits if the

Secretary determines that his 'impairment in fact prevents him from working.'" (quoting *Sullivan*

*v. Zebley*, 493 U.S. at 535)).

## B.  Factual and Procedural Background

Plaintiff, a 40-year-old woman with a high school degree, previously worked on and off

for ten years, variously, as a phone solicitor, van driver, and fundraiser.  Administrative Record

("AR") at 74–75, ECF No. 9.  She alleges that she became disabled on August 26, 2013, due to

three conditions: "cancer, bipolar [disorder], and asthma."  *Id.* at 65. [2]  Almost four years later,

on June 6, 2017, plaintiff filed, through counsel, an application for SSI benefits, which

application was initially denied on December 15, 2017, with reconsideration denied on March 1,

2018.  *Id.* at 93–98, 104–106, 107–109, 176–184.

### 1.  The Administrative Hearing

At plaintiff's request, an administrative hearing was held, via video teleconference,

before an administrative law judge ("ALJ") on August 1, 2019.  *Id.* at 15, 112–14.  After a brief

opening statement from plaintiff's counsel, the forty-minute hearing largely consisted of

testimony solicited by the ALJ from the plaintiff and from the SSA's "Designated Vocational

---

[2]     One of these three referenced conditions may be easily dismissed.  Although plaintiff cites "cancer" as a
basis for her entitlement to disability benefits, the record reflects that plaintiff "last had lung cancer in 2012 and has
been cancer free since" and "does not routinely see an oncologist."  AR at 67.  At the administrative hearing and in
her briefing before this Court, plaintiff has not relied on her prior cancer diagnosis to assert that this diagnosis
amounted to a continued impairment nor an adequate basis for finding her disabled.

Expert," *id.* at 290–91, whom the parties stipulated was an expert in "work related issues," including "the requirements . . . for certain jobs [and] how certain limitations can affect the ability to do certain types of work," *id.* at 32; *see also* 20 C.F.R. § 416.966(e) ("If the issue in determining whether [claimant] is disabled is whether [her] work skills can be used in other work and the specific occupations in which they can be used, . . . [the Commissioner] may use the services of a vocational expert or other specialist.").

In his opening statement, plaintiff's counsel conceded that while plaintiff had repeatedly complained of "back pain and leg weakness," the record contained no evidence of any medically determinable impairments to her back or legs and thus could not support a finding of disability. AR at 33. Instead, he highlighted her mental impairment, citing 2018 and 2019 medical records which he said indicated "issues with command hallucinations" that were somewhat alleviated by medication, and "exacerbations of her depression on a weekly basis." *Id.* at 34. In a somewhat convoluted fashion, counsel acknowledged that "the issue here is not that she's not somewhat stable at times[,] because she is and her medications are effective." *Id.* Nevertheless, he urged a finding that plaintiff was unable to work because the medication was "not effective enough to have her be stable all the time." *Id.* The ALJ then elicited testimony from plaintiff about her employment history, daily activities, and medical and psychological treatment. *Id.* at 34–51. Over the course of her testimony, plaintiff responded appropriately to the ALJ's questions and the hearing transcript reflects that she was able to concentrate and remain focused throughout the proceeding.

With respect to her prior work experience, plaintiff testified that she last worked in 2013 for "[a]bout two months" at "a company called Ace Marketing" where she went "[d]oor to door to get donations for [the] Child Fund," which required "a lot of walking." *Id.* at 35. Prior to that,

in 2012, she had worked "for maybe about three or four months" at "Transcend, Incorporated," where she drove "clients back and forth from their doctors' appointments." *Id.* at 36.  From 2006 to 2007, she worked for the U.S. Postal Service "deliver[ing] mail," *id.* at 37–38, but stopped "because the walking was affecting [her] legs," it was "too much on [her] body," and she "sprained [her] ankle within the [first] three month period," *id.* at 38.  Plaintiff also reported working in 2005 as a phone solicitor for various philanthropic causes, *id.* at 40, which job she left because "physically [she] couldn't do it" and "even just sitting for a certain amount of . . . time [she] would have to go and walk around the office" and "take breaks," *id.* at 41.

With respect to her current medical complaints—notwithstanding her counsel's concession that no medical records corroborated her subjective reports of physical pain nor did her initial SSI application name physical pain as a disability—plaintiff testified that she was "in so much pain right now," *id.* at 37, and repeated her complaint about suffering physical pain at least five times over the course of the hearing, *id.* at 42, 45, 46, 51, 54, including indicating during the hearing that she had to stand up due to physical discomfort, *id.* at 41.  She stated she could drive for ten or fifteen minutes at a time before she had to stop and stretch because her back caused her to be "always in pain."  *Id.* at 41–42.  She went grocery shopping "[s]ometimes with assistance," but would have to "sit down and take a break" after two aisles because of "pain from [her] neck all the way down" and pain and numbness in both her arms.  *Id.* at 45.

With respect to her daily activities, plaintiff again focused on the limitations presented by her back pain.  She described a typical day as "just staying in the house and trying to accomplish some chores with the assistance of [her] fiancé."  *Id.* at 42.  She sometimes required "help tying [her] shoes," "washing [her] back," and "getting in the tub because the pain is so strong."  *Id.* She "rarely" cooked, *id.* at 43; could "do certain things with laundry but [her] attention span is

not on the laundry" and her fiancé "ha[d] to assist her," *id.*; did the dishes "just when [she felt]

like it . . . but otherwise he assist[ed]" her, *id.*; did not watch television or do anything for fun, *id.*

at 44; and would "read a book here and there but [it was] not a routine," *id.*

With respect to her mental condition, plaintiff stated that on days when she was "totally

depressed," *id.* at 42, which she had "at least [twice] a week," she would not get dressed or "even

take a shower," *id.* at 43.  The voices she heard made it hard to "read and concentrate."  *Id.* at 50.

She "stay[ed] secluded" because she did not "get along with people very well," *id.* at 47, but

"[o]nce in a while" she would "go to church . . . down the street from [her] house," *id.* at 44.

Plaintiff testified that she took a psychiatric medication and other medication for HIV,

*id.* at 47, but that she continued to hear "[a] lot of different" voices "[a]ll the time" telling her to

kill herself and other people and sometimes she saw things that were not there, *id.* at 48.  She

stated that she took the psychiatric medication once a day in the evening because, when

medicated, "all [she does] is sleep," *id.* at 48–49, and by "the afternoon towards the evening" the

effect would wear off and she would "start hearing and seeing [things] again," *id.* at 49.  She

explained that her psychiatrist had recently "upped the dose" of her psychiatric medication,

resulting in "just a little difference" but her symptoms were "still going on," and that when she

was depressed, the voices were worse.  *Id.* at 50.

In response to questions posed by her counsel attempting to refocus her testimony from

her physical pain to her mental condition, plaintiff testified that she had "a couple days a week

where [her] depression is more intense and the hallucinations are worse."  *Id.* at 52.  She has a

history of "seven or eight arrests secondary to assault and altercations," *id.* at 55, that "still

happen[ed] . . . all the time when [she was] out," though no longer "escalate[d]," *id.* at 56.  She

concluded her testimony by stating that "mentally, emotionally, and physically [she] cannot work because [she is] not reliable." *Id.*

The ALJ then elicited testimony from the vocational expert in response to hypothetical questions about the ability of "a person of the claimant's age who is a younger individual [and] who has a high school education and past work as [a fundraiser, van driver, and phone solicitor]" to find "jobs in the national economy." *Id.* at 58. "If that person [were] limited to unskilled work that was simple, repetitive, and routine, [and] had only occasional public and coworker interaction," *id.*, the expert testified that jobs were available, including "room cleaner, . . . marker[, and] . . . copy machine operator," *id.* at 58–59, with the caveat that, if the person had to "avoid[] concentrated exposure to dust, fumes, [and] smoke," the expert "would not recommend cleaner but the other two occupations would be possible," *id* at 59. The ALJ then followed up with questions addressing concentration and persistence, asking "if the person had difficulty staying on the task of the job for whatever reason[,] how much time [they could] be off task and still maintain employment," and how many "absences" they could incur. *Id.* The vocational expert testified that the person could be off task "no greater than 10% [of the time] for unskilled and entry level occupations," *id.*, and that incurring "one absence a month for three consecutive months . . . would be considered excessive and not tolerated," *id.*, as "[e]mployers will tolerate a range of six to ten absences, unexcused, unanticipated absences over a 12 month period," *id.* at 60.

### 2. The ALJ's Decision

On August 28, 2019, less than one month after the hearing, the ALJ denied plaintiff's application in an eleven-page opinion, concluding that plaintiff was "not disabled under section 1614(a)(3)(A) of the Social Security Act." *Id.* at 25.

In reaching this conclusion, the ALJ had to grapple with the fact that plaintiff's "allegations are not fully consistent with the evidence of record," *id*. at 23, citing multiple instances in which plaintiff's testimony and self-reporting were belied by her prior statements and by consultative evaluations and examinations, *see, e.g., id.* at 22 (noting the inconsistency between plaintiff's hearing testimony that she does not "get along with people very well," *id.* at 47, and her reports to the consultative examiner that she "talks on the phone a great deal and hangs out with her friends," *id.* at 305, and the further inconsistency between plaintiff's hearing testimony that she last worked in 2013, *id.* at 35, and the note in her treatment file reflecting that "she started [a] job at Lyft" in June 2018, *id.* at 387); *see also id.* at 38–39 (during the hearing, asking plaintiff repeated questions about the duration of her prior employment at the postal service, where plaintiff testified she did not "work past [her] 90 day period," *id.* at 39, while initial SSA disability reports indicate she was employed there for almost a full year, from December 2006 to October 2007, *id.* at 207).

Set against this record, the ALJ found that plaintiff satisfied the first two steps of the five-step disability evaluation process.  First, despite apparently working as a Lyft driver for some period of time beginning in June 2018, *see id.* at 387—a work experience omitted from plaintiff's hearing testimony—the ALJ determined she had not engaged in "substantial gainful activity" since June 1, 2017, the date of her application, *id.* at 17.  At the second step, the ALJ found that plaintiff suffered from the "severe impairment" of bipolar disorder, which would "significantly limit [her] ability to perform basic work activities."  *Id*.  The ALJ also thoroughly addressed other medical conditions referenced in the record. [3]  For example, noting evidence in

---

[3]     Plaintiff's allegations of back and knee pain and pain and numbness in her arms, which she repeatedly mentioned during the hearing, were found by the ALJ not to be "medically determinable impairments," given the lack of any documented "diagnosis by an acceptable medical source of an actual impairment beyond the claimant's reported symptoms."  AR at 18.  At the hearing, plaintiff's counsel conceded as much.  *See id.* at 33 – 34.

the record indicating that plaintiff also had "medically determinable impairments in the form of asthma and HIV," the ALJ classified these as "nonsevere," finding "no indication that these impairments would impose more than minimal work-related functional limitations for 12 or more months." *Id.* at 17–18.  The ALJ also addressed previous findings by state agency consultative examiners that plaintiff had "environmental limitations" and should "avoid dust, fumes, smoke, and other respiratory irritants," stating that these opinions were not "persuasive" or "well supported, as they relied exclusively on [plaintiff]'s complaints of asthma and reports that she had been previously diagnosed," and were not corroborated by the consultative examination, at which plaintiff exhibited no "shortness of breath" or "difficulty breathing" and her "lungs were clear to auscultation." *Id.* at 18.  Nevertheless, the second step of the inquiry was satisfied due to plaintiff's qualifying severe mental impairment of bipolar disorder.

At the third step, the ALJ considered whether plaintiff's bipolar disorder was sufficiently severe to qualify as disabling based on the list of impairments set forth by the Commissioner in SSA Appendix 1.  For bipolar disorder to qualify as a disabling mental impairment, the condition must inhibit the claimant's ability to: (1) "[u]nderstand, remember, or apply information;" (2) "[i]nteract with others;" (3) "[c]oncentrate, persist, or maintain pace;" or (4) "[a]dapt or manage oneself."  SSA Appendix 1 § 12.04(B).  An "[e]xtreme limitation" in one of these four areas of mental functioning, or a "marked limitation" in two of these areas, would qualify a claimant's bipolar disorder as disabling.  *Id.*

Here, the ALJ determined that plaintiff had no extreme or marked limitations in mental functioning arising from her bipolar disorder.  Specifically, the ALJ found that plaintiff had only a "mild limitation" in "understanding, remembering, or applying information," citing her ability "to go out alone," drive a car, "use public transportation, indicating an ability to remember and

apply information regarding routes, locations, and schedules," "pay bills, indicating an ability to remember when they are due," count change, use a savings account, follow written and spoken directions, and "understand what she reads." AR at 19. Likewise, the ALJ found only "moderate" limitations in plaintiff's "interacting with others" and "adapting and managing [her]self," acknowledging plaintiff's description of herself as "not a people person," and self-reported "feelings of paranoia" and "frequent altercations with people," as well as reports that she "kept her eyes closed" during an "internal consultative evaluation" and "[d]uring examinations [had] . . . exhibited dramatic behavior and an irritable mood." *Id.* At the same time, however, this evidence was counter-balanced by record evidence that plaintiff self-reported that "she gets along great with authority figures," "talks on the phone with family four times per day and visits with them once every two weeks," *id.*; that she uses public transportation, attends services at several different churches, and lives with a fiancé, and "is able to go shopping in stores with him," *id.*; and that she "attend[s] her appointments, even when she is feeling very depressed" and "manages her finances independently," *id.* at 20; and "was also driving for Lyft in June 2018, indicating an ability to converse with and tolerate the people she drove," *id.* at 19. Further, during consultative examinations, plaintiff was "generally cooperative," "made appropriate eye contact," and "her manner of relating and social skills were adequate." *Id.* She also reported that she watches television, listens to music, exercises, and uses a computer and her phone to text, email, play games and engage in social media. *Id.* at 20.

Without challenging those findings regarding three of the four mental functioning areas, plaintiff focuses her dispute on the ALJ's finding that plaintiff had only "moderate" limitations in the fourth area of "concentrating, persisting, or maintaining pace." *See* Pl.'s Mem. in Supp. of Mot. for J. of Reversal ("Pl.'s Mem.") at 5–10, ECF No. 11-1. In analyzing plaintiff's moderate

limitation in concentrating, persisting, or maintaining pace, the ALJ again acknowledged plaintiff's testimony that "she has problems with her attention span" and the sleep-inducing side effects of her medication and her inability, when depressed, to shower, get dressed, or "do anything but spend the day in her room sleeping," as well as evidence that during consultative examinations her "attention and concentration were generally intact, but there were also instances when she was distractible." AR at 19. At the same time, plaintiff indicated her ability to "pay attention for 20 minutes" and "to finish what she starts," and the record from her consultative evaluations confirmed that her "attention and concentration were intact," citing her ability to "perform serial 7s, read, and successfully solve the four calculations presented to her." *Id*.

Since plaintiff did not exhibit any "extreme or . . . marked limitations in a broad area of functioning," the ALJ concluded that plaintiff's bipolar disorder did not meet the criteria of disabling impairments listed in the Commissioner's regulations, *id.* at 18, and proceeded to determine plaintiff's residual functional capacity, to inform the necessary determination at steps four and five. In assessing plaintiff's residual functional capacity, i.e., the extent to which her "impairment(s), and any related symptoms . . . may cause physical and mental limitations that affect what [she] can do in a work setting," even though her impairments do not qualify as disabling *per se*, 20 C.F.R. § 416.945(a)(1), the ALJ was required to consider "all the relevant medical and other evidence in [the] case record," *id.* § 416.920(e), and "all of [plaintiff's] medically determinable impairments of which [the Commissioner] is aware," *id.* § 416.945(a)(2), including her asthma and HIV, which at step two were found to be medically determinable but "nonsevere," AR at 18. Stating that she had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence

and other evidence," as well as "the medical opinion(s) and prior administrative medical findings(s)," the ALJ concluded that plaintiff had "the residual functional capacity to perform a full range of work at all exertional levels," but with two "nonexertional limitations," first, that plaintiff could "perform unskilled work that is simple, repetitive, and routine," and second, that plaintiff could "have occasional interaction[s] with the public and coworkers." *Id.* at 20.

In support of the assessment, the ALJ first discussed plaintiff's reports of her symptoms and the extent to which these self-reports were "consistent with the objective medical evidence." *Id*. The ALJ stated that although plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," her statements as to "the intensity, persistence[,] and limiting effects of these symptoms [were] not entirely consistent with the medical evidence." *Id.* at 21. In particular, the ALJ noted plaintiff's testimony that she was "unable to work because she is not mentally or emotionally reliable," "experiences consistent auditory and visual hallucinations," and "has days where she is so depressed that she may not shower or get dressed" and will "spend her entire day in her room sleeping," behavior which "can last for two week periods." *Id.* Yet, evidence from various consultative examinations showed that plaintiff presented "no evidence of hallucinations or paranoia" and exhibited "intact attention and concentration," while the ALJ acknowledged "periods of less optimal findings, such as depressed mood; impaired memory; . . . and distracted behavior," where plaintiff reported experiencing "auditory and visual hallucinations." *Id.* In considering this conflicting evidence, the ALJ concluded that plaintiff's "reported activities do not suggest that she is as limited as alleged," because she had reported during her consultative evaluation "that she was able to perform activities of daily living[] independently, including bathing, dressing, and grooming herself; cooking; general cleaning; [and] doing laundry" and because "[d]espite

alleging that she does not do well around people and that she gets into frequent altercations," she has a fiancé and "reported during her consultative evaluation that she talks on the phone a lot and spends time with friends." *Id.* at 22.

As for the medical opinions and prior administrative findings, the ALJ stated that she found each of the consultative opinions "somewhat persuasive," *id.* at 22–23, citing first the opinion that plaintiff could "understand, remember, and carry out simple tasks and . . . attend and concentrate for extended periods," which she found was supported by evidence from plaintiff's examinations that she had a "memory impairment, . . . was both distractible and exhibited good attention and concentration, . . . [and] exhibited both a labile and goal directed thought process." *Id.* at 22.  The ALJ also discussed the opinion of a consultative psychologist, Gregory Price, Ph.D., that plaintiff could understand "both simple and complex instructions" and "had a mild limitation in sustaining an ordinary routine and regular attendance; . . . a moderate limitation in controlling her behavior;" and "no limitation in social interaction," although she gave less weight to this final conclusion, finding the "longitudinal record [was] consistent with greater limitations on the claimant's ability to interact with others." *Id.* at 22–23.  The ALJ concluded that a limit to unskilled and simple work was "consistent with the longitudinal record and the claimant's subjective complaints which revealed . . . intact attention and concentration and good judgment, as well as below average intellectual functioning, distracted behavior, and impaired memory." *Id.* at 22.

At step four, the ALJ cited testimony from the vocational expert that "the demands of the claimant's past relevant work" as a phone solicitor, van driver, and fundraiser "exceed[ed] her residual functional capacity," meaning that plaintiff was "unable to perform any past relevant work." *Id.* at 23.  The ALJ then proceeded to the fifth and final step.

At step five, the ALJ found that jobs "exist[ed] in significant numbers in the national economy" for which plaintiff could "perform the requirements," based on her "age, education, work experience, and residual functional capacity," with such jobs including room cleaner, marker, and copy machine operator.  *Id.* at 24–25.  The ALJ concluded, therefore, that the plaintiff was not disabled.  *Id.* at 25.

### 3.  Instant Lawsuit

Plaintiff sought review of the ALJ's decision by the SSA Appeals Council, which denied the request, on May 28, 2020, stating that the "reasons that [plaintiff] disagree[d] with the decision . . . do not provide a basis for changing the [ALJ]'s decision" and finding "no reason under our rules to review" it.  *Id.* at 1.  The Appeals Council denial rendered the ALJ's decision the final decision of the Commissioner.  *Id*.

 Plaintiff thereafter instituted the instant action, on July 29, 2020, seeking reversal or remand of the Social Security Administration's final decision denying her benefits.  The parties' cross-motions are now ripe for resolution.

## II.   STANDARD OF REVIEW

The Social Security Act provides federal district courts jurisdiction over civil cases challenging a final decision of the Commissioner of Social Security, and empowers a district court "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. §§ 405(g), 1383(c)(3).  The reviewing court must uphold the decision of the Commissioner if it is based on substantial evidence in the record and the correct application of the relevant legal standards.  *Id.* § 405(g); *see also Butler*, 353 F.3d at 999; *Jones*, 647 F.3d at 355.  Substantial-evidence review is deferential to the agency factfinder, and has been understood to "mean[]—and mean[] only—'such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  This standard requires "something 'more than a scintilla' but 'less than a preponderance of the evidence.'" *Cal. Pub. Util. Comm'n v. FERC*, 20 F.4th 795, 802 (D.C. Cir. 2021) (quoting *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002)).  Plaintiff bears the burden of proving the Commissioner's decision is not supported by substantial evidence.  *See Butler*, 353 F.3d at 999.  "Because disability cases of this sort are so fact-intensive and fact-dependent, the standard of review poses a high bar to clear in order to overturn the agency's decision."  *Page v. Berryhill*, 688 F. App'x 7, 9 (D.C. Cir. 2017).

The reviewing court "must carefully scrutinize the entire record," mindful that its role is "not to determine . . . whether [the plaintiff] is disabled," but only to assess "whether the ALJ's finding that she is not is based on substantial evidence and a correct application of the law." *Butler*, 353 F.3d at 999.  In applying this standard, the reviewing court "must also be mindful of the harmless-error rule" such that even if error is perceived, the Commissioner's decision is affirmed "unless the error is prejudicial." *Saunders*, 6 F.4th at 4.  Further, the court, "in dealing with a determination or judgment which an administrative agency is alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *Jones*, 647 F.3d at 356 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

## III.    DISCUSSION

The ALJ's findings on steps one through three, including that plaintiff has an "impairment" in the form of bipolar disorder and that her condition does not qualify as a "disabling" impairment under the Commissioner's regulations, are not disputed.  *See* Pl.'s Mem. at 2; Def.'s Mem. in Supp. of Mot. for J. of Affirmance and in Opp'n to Pl.'s Mot. for J. of

Reversal ("Def.'s Opp'n") at 1, 3, ECF No. 13. [4]  The parties disagree as to the sufficiency of the

ALJ's assessment of plaintiff's residual functional capacity, which assessment informed steps

four and five of the inquiry as to whether plaintiff is disabled and entitled to SSI benefits. *See*

Pl.'s Mem. at 3–13; Def.'s Opp'n at 7–13.

Plaintiff contends that the ALJ's assessment of her residual functional capacity has two

flaws.  First, plaintiff claims that the ALJ "failed to properly perform this assessment" of her

limitations by failing to include "any limitation upon concentration or persistence" in plaintiff's

residual functional capacity assessment.  Pl.'s Mem. at 5. [5]  Second, plaintiff asserts that the ALJ

"failed to properly evaluate [her] subjective complaints" by applying an improper standard. *Id.*

at 10.  Defendant counters that the ALJ's opinion is thorough, supported by substantial evidence,

and adequately accounts for plaintiff's moderate limitations in concentration, persistence, or

maintaining pace in the residual functional capacity assessment.  Def.'s Opp'n at 7 (citing AR at

20–23).  Plaintiff's two arguments challenging the adequacy of the ALJ's decision are addressed

*seriatim* below.  The Court agrees with defendant that the ALJ issued a well-reasoned decision

that fairly and transparently evaluated the conflicting record evidence, including in the

assessment of plaintiff's residual functional capacity.

---

[4]     While defendant notes plaintiff's reports that she was working for Lyft after she applied for SSI benefits, and well after the date she allegedly became disabled, *see* Def.'s Opp'n at 2, 3, 13, the parties accept the ALJ's determination, at step one of the disability inquiry, that plaintiff has not "engaged in substantial gainful activity" since the application date of June 1, 2017. *See id.* at 14 ("The ALJ's conclusion that Plaintiff is not entitled to SSI under the Social Security Act is supported by substantial evidence and was reached through the proper application of the law.").

[5]     Plaintiff also contends that the ALJ erred in failing to incorporate the plaintiff's moderate limitations in concentrating, persisting, or maintaining pace into the hypothetical questions posed to the vocational expert, *see* Pl.'s Mem. at 5, but the follow-up questions posed by the ALJ adequately account for this moderate mental functioning limitation.  Specifically, the ALJ followed up with questions addressing concentration and persistence, AR at 59–60, which directly target the issue of plaintiff's limitations in concentration, persistence, or maintaining pace.  A hypothetical "question" asked of a vocational expert at step five need not be a single question so much as a line of inquiry, provided that the claimant's limitations are eventually addressed fully. *See Cunningham v. Colvin*, 46 F. Supp. 3d 26, 37 (D.D.C. 2014) (approving of a hypothetical question which included follow-ups).  This task was accomplished here with the vocational expert.

**A.  The Residual Functional Capacity Assessment**

Plaintiff challenges the legal sufficiency of the ALJ's residual functional capacity assessment, Pl.'s Mem. at 3–10, arguing that the ALJ should have better incorporated the finding of plaintiff's moderate limitation in concentration, persistence, or maintaining pace into her assessment of plaintiff's "ability to do sustained work-related physical and mental activities," *id.* at 3 (quoting SSR 96–8p, *Assessing Residual Functional Capacity in Initial Claims* (the "SSA RFC Ruling"), 1996 WL 374184, at *1 (SSA July 2, 1996)).  The Court finds that the ALJ adequately accounted for all of plaintiff's impairments and limitations, and thus properly performed the residual functional capacity assessment.

The residual functional capacity assessment is a "'function-by-function' inquiry based on all of the relevant evidence of a claimant's ability to do work," *Butler*, 353 F.3d at 1000 (quoting SSA RFC Ruling at *3), "which means '8 hours a day, for 5 days a week, or an equivalent work schedule,'" *Petty v. Colvin*, 204 F. Supp. 3d 196, 200 (D.D.C. 2016) (quoting SSA RFC Ruling at *1).  This assessment must explain "how [the ALJ] considered and resolved any material inconsistencies or ambiguities evident in the record, as well as the reasons for rejecting medical opinions in conflict with the ultimate [residual functional capacity] determination."  *Butler*, 353 F.3d at 1000 (internal quotation marks omitted).  In other words, the ALJ must build a "logical bridge" from the evidence to her conclusion about the claimant's residual functional capacity. *Banks v. Astrue*, 537 F. Supp. 2d 75, 84 (D.D.C. 2008); *see also Lane–Rauth v. Barnhart*, 437 F. Supp. 2d 63, 67–68 (D.D.C. 2006) (remanding case where ALJ merely listed all the evidence without explaining which evidence led him to his conclusion or why he discounted contrary pieces of evidence).

At step three, the ALJ determined plaintiff had a mild limitation in "understanding, remembering, or applying information," and moderate mental limitations in the other three

18

mental functioning areas, namely: in interacting with others, adapting or managing herself, and concentrating, persisting, or maintaining pace.  AR at 19–20.  The last limitation affects plaintiff's "ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."  *Petty*, 204 F. Supp. 3d at 206 (citing SSA Appendix 1 § 12.0).  Thereafter, the ALJ assessed plaintiff's residual functional capacity as allowing for "a full range of work at all exertional levels but with the following nonexertional limitations:  the claimant can perform unskilled work that is simple, repetitive, and routine . . . [and can] have occasional interaction with the public and coworkers."  AR at 20.

Plaintiff argues that the ALJ's residual functional capacity assessment is inadequate because it does not "specifically address[] concentration, persistence, or pace."  Pl.'s Mem. at 6 (citing *Stewart v. Astrue*, 561 F.3d 679, 684–85 (7th Cir. 2009)). [6]  According to plaintiff, limiting her residual functional capacity to "unskilled work that is simple, repetitive, and routine," AR at 20, fails to "capture[] [her] moderate mental limitations in concentration, persistence, or pace," Pl.'s Mem. at 8 (quoting *Petty*, 204 F. Supp. 3d at 206), because "the ability to perform simple tasks differs from the ability to stay on task," *id.* at 7–8 (quoting *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015), and citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010)).

---

[6]     Plaintiff suggests that the ALJ is required to address plaintiff's moderate limitation in concentration, persistence, or pace in a similarly explicit manner as the limitation in interacting with others, which limitation contributed to the ALJ's decision to limit plaintiff's work to jobs involving only "occasional interaction with the public and coworkers."  *See* Pl.'s Opp'n to Def.'s Mot. for J. of Affirmance and Reply Supp. Pl.'s Mot. for J. of Reversal ("Pl.'s Opp'n") at 3, ECF No. 15 (citing AR at 22–23).  At the same time, the residual functional capacity assessment does not explicitly link plaintiff's moderate limitation in managing herself, AR 20, to any specific limitation and, yet, plaintiff has not challenged this aspect of the ALJ's decision, *see* Pl.'s Mem. at 5.  This only demonstrates that such explicit linkage is not necessary when the overall narrative discussion by the ALJ reflects consideration of all relevant abilities and limitations, taking into account inconsistencies in the record, and adequately explains the assessment of the claimant's ability to perform work of a certain type.

Here, the ALJ appropriately and convincingly accounted for plaintiff's moderate mental limitations in concentrating, persisting, or maintaining pace in conducting the residual functional capacity assessment.  The ALJ first noted plaintiff's testimony that she "has problems with her attention span and memory," AR at 21, which was corroborated in other parts of the record indicating that plaintiff had "complained of . . . concentration difficulties; . . . periods of rage; . . . and low frustration tolerance," *id.* (citing *id.* at 303, 333).  She then cited the reports of plaintiff's past medical and psychiatric examinations, where plaintiff had been "alert and oriented to person, place and time," and exhibited "intact attention and concentration," *id.* (citing *id.* at 342), along with reports of "periods of less optimal findings," including where plaintiff had displayed "distracted behavior," *id.*  The ALJ took into account that plaintiff had "showed improvement with medication" and "attempted other treatment modalities, including psychotherapy," through which she had "made progress," although she was "not always compliant with treatment."  *Id.*

Turning to the underlying disability determinations conducted in connection with plaintiff's SSI application, the ALJ noted the opinions of the consulting examiners that plaintiff was "able to understand, remember, and carry out simple tasks and make decisions within a simple work setting" and "could attend and concentrate for extended periods."  *Id.* at 22 (citing *id.* at 74, 87).  She also cited the opinion of Dr. Price, who found that plaintiff "could understand both simple and complex instructions [and] . . . had a mild limitation in sustaining an ordinary routine and regular attendance."  *Id.*  The ALJ found these opinions were well supported by the records of plaintiff's consultative examinations, during which she "was both distractible and exhibited good attention and concentration, her memory was intact, and she exhibited both a labile and goal directed thought process."  *Id.* at 22.  The ALJ stated that she found these opinions "somewhat persuasive" overall, disagreeing with the examiners' opinions as to

plaintiff's interpersonal skills and asserting that "the longitudinal record is consistent with

greater limitations on the [plaintiff]'s ability to interact with others." *Id.* at 22–23.  As for the

consultative opinions that plaintiff was "limit[ed] to unskilled and simple work," however, she

found this limitation was "consistent with the longitudinal record and the [plaintiff]'s subjective

complaints which revealed both intact memory,  . . . intact attention[,] and concentration and

good judgment, as well as below average intellectual functioning, distracted behavior, and

impaired memory." *Id.* at 22.  She concluded her assessment stating that plaintiff's

"impairments are accommodated with the mental limitations discussed above," at the third step

of the disability inquiry, and "[b]ecause [plaintiff]'s allegations are not fully consistent with the

evidence of record, no other limitations are warranted." *Id.* at 23.

The ALJ's detailed engagement with the full record, including plaintiff's extensive

treatment history and her own subjective complaints, demonstrates that the ALJ considered and

accounted for plaintiff's limitations in concentration, persistence, or maintaining pace in

assessing her residual functional capacity, most explicitly with the statement that the "limitation

to unskilled and simple work is . . . consistent with the longitudinal record and the [plaintiff]'s

subjective complaints which revealed . . . intact attention and concentration and good judgment,

as well as . . . distracted behavior." *Id.* at 22.  In contrast to other cases where remand was

necessary due to the ALJ's failure to consider contradictory evidence, the ALJ here fully

addressed contradictory findings and conclusions in the record. *Cf. Jones*, 647 F.3d at 356–57

(remanding where ALJ failed to explain reason for rejecting treating physician opinion or to cite

any conflicting or contradicting evidence in record); *Butler*, 353 F.3d at 1002 (remanding ALJ

decision that failed to state reason for not applying treating physician rule and did not

acknowledge contradictory evidence in the record that supplied reason for rejecting the treating

physician's opinion).  Contrary to plaintiff's contentions, the ALJ did not ignore evidence

reflecting "periods of relative stability, as well as periods of exacerbation of [plaintiff's]

psychiatric condition," Pl.'s Opp'n to Def.'s Mot. for J. of Affirmance and Reply Supp. Pl.'s

Mot. for J. of Reversal ("Pl.'s Opp'n") at 3, ECF No. 15, which she indeed acknowledged with

her careful consideration of the entire "longitudinal record" and her references to the "periods of

less optimal findings" where plaintiff's bipolar disorder appeared to pose greater limitations, AR

at 21–22.

The ALJ credited plaintiff's complaints where they were supported by the record, giving

them full consideration despite the inconsistencies between her subjective complaints and her

reported activities and conduct at the hearing.  *See Shinaberry v. Saul*, 952 F.3d 113, 122 (4th

Cir. 2020) (affirming decision based on ALJ's reasoning that plaintiff's "statements that 'she

does not know how long she can pay attention, sometimes finishes what she starts, and follows

spoken instructions not the best' . . . combined with [her] trouble with memory tasks as noted

during the psychological consultative examination, . . . support the additional mental limitation

restricting the claimant to jobs requiring only simple, routine, repetitive tasks"). [7]

In any event, even if the ALJ had failed to account for plaintiff's moderate limitation in

concentration, persistence, or maintaining pace in assessing her residual functional capacity—

though no such failure occurred—such error would be harmless so long as the record contained

---

[7]        While conceding that the ALJ "mentioned the Plaintiff's ability to concentrate for extended periods,"
plaintiff argues that the explanation is still inadequate because the ALJ "did not mention or address the Plaintiff's
ability to persist or keep up a pace."  Pl.'s Opp'n at 3.  This argument is unavailing, as plaintiff points to nothing in
the record—and indeed the record does not appear to contain any evidence—indicating any distinct limitations in
persisting or maintaining pace, beyond the evidence of her "concentration difficulties."  AR at 21.  To the extent
plaintiff is suggesting that the residual functional capacity assessment must explicitly use the terms "persisting" and
"maintaining pace" to qualify as adequate, this is incorrect.  An ALJ's use of specific talismanic words is not the
measure of whether the Commissioner's SSA disability determination should be affirmed or remanded.  Instead, the
Court must review the fact-intensive, step-by-step analysis performed by the ALJ to ensure that this analysis is
carefully tailored to the claimant's unique symptoms and impairments and is based on substantial evidence in the
record and correct application of the law.

"substantial evidence" demonstrating that plaintiff could "engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace." *McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014) (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)); *see also Sizemore v. Berryhill*, 878 F.3d 72, 81 (4th Cir. 2017) ("[E]ven were we to accept [plaintiff]'s premise that the ALJ failed to address each of the limitations . . . , we would nonetheless conclude that the ALJ's decision is supported by substantial evidence" and affirm); *Saunders*, 6 F.4th at 4 ("[E]ven if we perceive error, we will affirm the Commissioner's decision unless the error is prejudicial.").  As reflected above, the record is replete with evidence demonstrating that plaintiff can engage in unskilled work despite her limitations.  The ALJ's residual functional capacity assessment is therefore based on substantial evidence and successfully builds a "logical bridge," *Banks*, 537 F. Supp. 2d at 84, from the testimony to her resulting conclusions regarding plaintiff's ability to procure and maintain employment.

## B.  The Evaluation of the Plaintiff's Subjective Complaints

Plaintiff also argues that the ALJ erred in conducting the disability inquiry because she "failed to properly evaluate [plaintiff's] subjective complaints," Pl.'s Mem. at 10, by "fail[ing] to provide an accurate and logical bridge to support her credibility determination" and "fail[ing] to consider the limited extent to which the Plaintiff was capable of performing daily activities, and the manner in which the Plaintiff's activities diminished over time," *id.* at 13.  As explained below, the Court finds the ALJ properly evaluated plaintiff's credibility and subjective complaints in the full context of the record before her.

To determine "whether a claimant suffers from symptoms . . . that affect her ability to perform basic work activities," SSA regulations set forth a two-step analysis.  *Butler*, 353 F.3d at 1004 (citing, *inter alia*, 20 C.F.R. § 416.929).  First, "the ALJ must consider whether there is an 'underlying medically determinable' impairment that 'could reasonably be expected to produce'

the individual's 'symptoms.'"  *Page*, 688 F. App'x at 9–10 (quoting SSR 96–7p, *Evaluation of Symptoms in Disability Claims: Assessing the Credibility of An Individual's Statements* (the "SSA Credibility Ruling"), 1996 WL 374186, at *2 (SSA July 2, 1996)).  Second, "the ALJ 'must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which [they] limit the individual's ability to do basic work activities,'" *id.* at 10 (quoting SSA Credibility Ruling at *2), including by "evaluat[ing] the claimant's credibility regarding the alleged limiting effects of his symptoms," *id.*  To assess the claimant's credibility, the ALJ must consider factors including, *inter alia*: (1) "the individual's daily activities," (2) "the location, duration, frequency, and intensity of the individual's . . . symptoms," (3) the "effectiveness[] and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms," and (4) "treatment, other than medication, the individual receives or has received for relief."  *Grant v. Astrue*, 857 F. Supp. 2d 146, 156 (D.D.C. 2012) (quoting SSA Credibility Ruling at *3).  Determining the claimant's credibility "is solely within the realm of the ALJ," and the "reviewing court will only intercede where an ALJ fails to articulate a rational explanation for his or her finding."  *Id.; see also Brown v. Bowen*, 794 F.2d 703, 709 (D.C. Cir. 1986) ("The ALJ is certainly entitled to weigh conflicting opinions and to make his own assessment of their credibility.").

Here, at step one, the ALJ found that plaintiff's medically determinable impairments, namely her bipolar disorder, could reasonably be expected to cause the alleged symptoms, including her inability "to work because she is not mentally or emotionally reliable."  AR at 21.

At step two, however, the ALJ found that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  *Id.*  She first noted evidence in the record of

plaintiff's complaints of "irritability; . . . social withdrawal; moodiness; periods of rage; . . . and low frustration tolerance," and examinations where she displayed "dramatic behavior" and "an irritable mood," as well as exam records reporting plaintiff to be "pleasant and cooperative;" and exhibiting "coherent and goal oriented thought processes; . . . appropriate mood and affect; and good insight and judgment." *Id.*

Turning to plaintiff's own statements, the ALJ concluded that plaintiff's "reported activities do not suggest that she is as limited as alleged," offering as example her attendance of "church services at several different churches," her ability to "perform activities of daily living[] independently, including bathing, dressing, and grooming herself; cooking; general cleaning; doing laundry; using public transportation; and managing money." *Id.* at 22.  The ALJ also noted a conflict between plaintiff's testimony at the hearing that she had not worked since 2013, and her "report[s] during examinations in June 2018 that she was working for Lyft," as well as a conflict between plaintiff's testimony that "she does not do well around people and that she gets into frequent altercations" and her "report[s] during her consultative evaluation that she talks on the phone a lot and spends time with friends." *Id.*  The ALJ further cited evidence suggesting that while plaintiff "showed improvement with medication" and had "attempted other treatment modalities, including psychotherapy," *id.* at 21, she "was not consistently compliant with her medication" or attending her appointments, *id.* at 22.  The ALJ also noted the record "does not indicate any periods of inpatient hospitalization" since plaintiff allegedly became disabled in 2013. *Id.*

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because she failed to consider "the limited fashion [in which] the plaintiff engages in some of the activities she described."  Pl.'s Mem. at 12 (quoting *Higgins v. Saul*, No. 16-cv-27 (RBW), 2019

WL 4418681, at *12 (D.D.C. Sept. 16, 2019)).  For example, plaintiff points to evidence in the record that she does not engage in her reported activities consistently, such as her testimony before the ALJ that she goes to church "[o]nce in a while," AR at 44; rarely cooks or does laundry, *id.* at 43; that "at least two days" a week she stays in her bedroom and does not "get dressed," *id.*; and that she has trouble focusing due to "hearing voices all the time," *id.* at 50. Conversely, defendant argues that the ALJ "reasonably considered Plaintiff's subjective complaints in light of the full record," Def.'s Opp'n at 13, and properly "articulat[ed] . . . the inconsistencies that led her to determine that [plaintiff's] statements regarding the intensity, persistence and limiting effects of the symptoms were not entirely consistent with the evidence, leaving no reason for this [C]ourt to intercede," *id.* at 12 (citing AR at 20–23).

The Court agrees with defendant that the ALJ carefully considered plaintiff's subjective complaints, among all the other evidence before her, and assigned them an appropriate weight consistent with her determination of plaintiff's credibility.  Drawing on several of the factors outlined by the SSA for evaluating credibility, *see* SSA Credibility Ruling at *3, the ALJ considered plaintiff's purported daily activities; her testimony regarding the duration and frequency of her bipolar symptoms; the contrast in her behavior and affect across various evaluations in the record; the effectiveness of the psychiatric medication in alleviating her symptoms; and her inconsistent engagement with psychotherapy for relief, *see* AR at 21–23.  In doing so, the ALJ appropriately evaluated plaintiff's subjective complaints against the backdrop of the full record of evidence available.  Contrary to plaintiff's assertions, the ALJ found and credited support in the record for plaintiff's subjective complaints, *see id.* at 21, belying any suggestion that the ALJ "fail[ed] to consider this evidence of the plaintiff's limitations," Pl.'s

Mem. at 12 (quoting *Higgins*, 2019 WL 4418681, at *12), in reaching her conclusions. [8]  As

such, the ALJ constructed a logical bridge to support her evaluation of plaintiff's subjective

complaints, and her credibility determination is supported by substantial evidence.  *See*

*McCormick v. Saul*, No. 18-cv-1704 (CKK), 2021 WL 2634732, at *10 (D.D.C. June 25, 2021)

(finding ALJ's credibility determination was supported by "substantial evidence," despite

plaintiff's "protestations and post hoc explanations," because "[o]verall, the ALJ weighed the

evidence and concluded that the Plaintiff's statements as to the intensity, persistence and limiting

effects of her symptoms were not entirely consistent with the medical evidence and other record

evidence").

Second, plaintiff's contention that the ALJ failed to account for the "limited fashion" in

which plaintiff engaged in her daily activities, or arrived at her conclusions regarding plaintiff's

reported activities despite an "absence of any [supportive] findings or evidence" in the record,

Pl.'s Mem. at 12, is also misguided.  To the contrary, the record includes ample evidence

suggesting that plaintiff engaged in her daily activities for greater periods of time than what she

stated in her hearing testimony.  *See, e.g.,* AR at 299 (report from 2017 consultative medical

examination indicating that plaintiff "cooks three times a week[,] . . . cleans daily, does laundry

once a week, . . . showers or takes a bath and dresses daily[,] . . . watches TV, listens to the radio,

reads, goes out, [and] socializes with friends), *id.* at 305 (report from 2017 consultative

psychological evaluation where plaintiff stated that she "dresses, bathes, and grooms herself[,] . .

. engages in general cleaning, does laundry, shops, takes public transportation, and manages the

money," and "talks on the phone a great deal and hangs out with her friends").  The ALJ's

---

[8]        Furthermore, to the extent that plaintiff's daily activities are hindered by her back pain, which she cited as
the source of her difficulty with shopping, AR at 45, plaintiff has conceded that this pain is "not medically
determinable," and thus outside the scope of evidence available to the ALJ to evaluate her disability, *id.* at 33–34.

conclusion that plaintiff engaged in daily activities to a greater extent than she admitted in her testimony is thus well supported by the record.

Plaintiff's reliance on *Brown v. Comm'r Soc. Sec.*, 873 F.3d 251 (4th Cir. 2017), is misplaced.  There, the reviewing court found that the ALJ had "[mis]characterized [the medical records] as showing that Brown had been exercising and doing a lot of physical activity," despite his subjective complaints of "disabling pain," when in fact his medical records "actually reflected" much more limited attempts at physical activity that had "aggravat[ed] his physical impairments and pain each and every time."  *Id.* at 270.  Here, the ALJ made no such mistake: her conclusion that plaintiff's "reported activities do not suggest that she is as limited as alleged," AR at 22, is well supported by plaintiff's own prior inconsistent statements, and thus the ALJ did not err in declining to give plaintiff's hearing testimony overwhelming weight.  *Cf. Grant*, 857 F. Supp. 2d at 156 (affirming ALJ decision in part because "the ALJ did acknowledge many of Grant's limitations" and "did not overstate her acknowledged ability to perform activities" of daily living, but also observed that her "overall demeanor and ability to answer questions quite clearly were not suggestive of a person experiencing disabling limitations" (internal quotation marks and citations omitted)).

In evaluating a claimant's credibility regarding her subjective complaints, "[a]ll information submitted by the claimant must be considered," *Jackson v. Barnhart*, 271 F. Supp. 2d 30, 36 (D.D.C. 2002), which is precisely what the ALJ did in this case.  Contradictory evidence in the record requires judgments as to credibility and persuasiveness, and the ALJ is the appropriate person to make them.  The "reviewing court will only intercede where an ALJ fails to articulate a rational explanation for his or her finding," *Grant*, 857 F. Supp. 2d at 156, and,

given the sufficiency of the ALJ's reasoning underlying the final determination at issue, the Court finds no reason to intercede here.

<p style="text-align:center">*     *     *</p>

The Commissioner correctly asserts that a reviewing court must not "reweigh the evidence and replace the SSA Commissioner's judgment regarding the weight of the evidence with its own."  Def.'s Mot. at 13 (quoting *Cunningham*, 46 F. Supp. 3d at 36 (internal alterations omitted)).  Yet, the reviewing court has a responsibility to "carefully scrutinize the entire record to ensure that the Commissioner, through the ALJ, has both analyzed all of the evidence available and has sufficiently explained [her] reasoning and the weights given to the facts." *Pinkney v. Astrue*, 675 F. Supp. 2d 9, 14 (D.D.C. 2009) (citing *Butler*, 353 F.3d at 999). Reviewing the instant record, the Court is more than satisfied that the ALJ properly considered the full record and plaintiff's medically determinable impairments, and produced a thorough and well-reasoned opinion supporting her findings and ultimate determination that plaintiff is not disabled.

## IV.   CONCLUSION

For the reasons set forth above, the Social Security Administration's final decision denying plaintiff's claim for SSI benefits is supported by substantial evidence in the record and was reached through the proper application of law, and therefore must be affirmed.  Accordingly, plaintiff's motion for a judgment of reversal is denied and defendant's cross-motion for a judgment of affirmance is granted.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: February 4, 2022

<p style="margin-left:50%">_____<br>BERYL A. HOWELL<br>Chief Judge</p>